UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DAVID HALBERT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-02879-JMS-MJD |
| | ) | |
| WEXFORD OF INDIANA, LLC, | ) | |
| GEO GROUP INC., | ) | |
| MICHELLE BALL,[1] | ) | |
| CHRISTOPHER J. SHERRON, | ) | |
| HEATHER N. DAVIS, | ) | |
| ALUMNI STAFFING, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**Order on Pending Motions for Summary Judgment**

David Halbert brought this lawsuit against a correctional officer and three medical providers along with their employers alleging they were deliberately indifferent to his serious medical needs. As an inmate at New Castle Correctional Facility ("New Castle"), Mr. Halbert relied on Defendants to access medical care. Over the course of a few months his hypertension went untreated which culminated in congestive heart failure caused by a hypertensive crisis. Each defendant requests summary judgment, and Mr. Halbert opposes these requests. *See* dkts. 100, 101, 102, 103, 105.

For the reasons explained below, Wexford of Indiana, LLC, Officer Michelle Ball, and Alumni Staffing, LLC (hereinafter "Dr. Robertson"),[2] are entitled to judgment as a matter of law. Accordingly, the motion for summary judgment seeking resolution of the claims based on the

---

[1] The **clerk is directed** to update the docket to reflect the full name of Defendant Michelle Ball.
[2] Dr. Kenneth Robertson, M.D., died on November 11, 2020. Dkt. 113. Alumni Staffing, LLC is the appropriate successor and was substituted for Dr. Robertson on September 10, 2021. Dkt. 127.

actions of Dr. Robertson, dkt. [91], is **GRANTED**. The motion for summary judgment filed by GEO and Officer Ball, dkt. [95] is **GRANTED** as to Officer Ball and **DENIED** as to GEO. The motion for summary judgment filed by defendants Heather N. Davis, Christopher J. Sherron, and Wexford, dkt. [85], is **GRANTED** as to Wexford and **DENIED** as to Ms. Davis and Mr. Sherron.

### I. Summary Judgment Legal Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

### II. Material Facts

Consistent with the legal standards set out above, the following facts are undisputed. That is, these statements of fact are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and any disputed evidence are presented in the light most favorable to Mr. Halbert, the non-moving party.

2

Mr. Halbert was at all times relevant to his amended complaint an Indiana Department of Correction ("IDOC") inmate and incarcerated at New Castle.

**A. March 30, 2018**

Mr. Halbert began experiencing wheezing and shortness of breath for the first time at the end of March 2018. Dkt. 87-4 at p. 6. On March 29, he submitted a Request for Healthcare that stated, "I have some serious wheezing in my chest, and I've been coughing a lot, and I am very short of breath, it's hard for me to breathe." Dkt. 103-1 at p. 17 (minor spelling errors corrected).

On March 30, 2018, Mr. Halbert was seen at a Nurse Visit to address his complaint of "some serious wheezing in his chest." Dkt. 93-1 at p. 42. Mr. Halbert reported to the nurse that he had been coughing a lot and was "very short of breath." *Id.* His blood pressure was 144/99, pulse was 96, and respiration rate was 20. His pulse oximetry was 100% on room air. Nurse Isaacs evaluated Mr. Halbert in the medical clinic, and she commented that while Mr. Halbert complained of cough with shortness of breath, no wheezing was noted during examination. *Id.* at p. 44. Nurse Isaacs performed a peak flow test, which was recorded as 520. *Id.* Mr. Halbert's blood pressure was elevated that day, so she ordered him to monitor his blood pressure for the next two weeks on Mondays, Wednesdays, and Fridays, and to then follow up as needed.

A Z-Pack antibiotic was ordered for Mr. Halbert's cough. *Id.* at p. 44. Mr. Halbert testified that he received the Z-Pack with six pills as ordered. Dkt. 87-4 at p. 6; dkt. 103-1 at p. 8. Dr. Robertson signed the medical record on March 31, 2021. Dkt. 93-1 at pp. 44-45.

**B. April 2018**

On April 2, 2018, Mr. Halbert reported for a blood pressure check. Dr. Robertson examined Mr. Halbert, diagnosed him with hypertension, and prescribed Lisinopril. Dkt. 93-2 at p. 19. Mr. Halbert did not receive this medication for two months and 10 days. *Id.*; Dkt. 103-1 at p. 8.

3

On April 11, 2018, Mr. Halbert presented to the prison medical clinic for a blood pressure check. He was assessed by Lisa A. Blount, R.N. Dkt. 93-1 at p. 46. Mr. Halbert's blood pressure was again elevated at 151/106, and his pulse was 94. He had still not received any Lisinopril. Dkt. 93-2 at p. 19.[3] Mr. Halbert's medical records reflect that his initial active order for Lisinopril from Dr. Robertson began April 11, 2018 and continued through October 10, 2018. Dkt. 87-3 at ¶ 5; dkt. 87-5 at p. 5.[4]

Lisinopril is an angiotensin-converting enzyme ("ACE") inhibitor that relaxes blood vessels so blood can flow more easily. It is used primarily for first-line medical treatment of high blood pressure and heart failure. Dkt. 93-3 at ¶ 18. Dr. Robertson's expert witness, Dr. Christopher M. Zietlow, M.D., Ph.D., opined that Dr. Robertson's selection of Lisinopril was both medically appropriate and timely to address the patient's newly diagnosed hypertension. Dkt. 93-3 at ¶ 18. Lisinopril is a good, first-line anti-hypertensive medication to initiate upon a diagnosis of hypertension. The dosage that was ordered and approved by Dr. Robertson on April 11, 2018, was a standard dose for a patient like Mr. Halbert. *Id.* at ¶ 9.

Dr. Zietlow further opined that there was no indication on April 11, 2018, for Mr. Halbert to undergo an EKG. He was not presenting with new onset chest pain, radiation to the arm, or exertional shortness of breath. An EKG performed on April 11, 2018, would not have been

---

[3] There is some evidence that the Lisinopril was not prescribed until April 11, 2018, but on summary judgment the facts and evidence are viewed in the light most favorable to Mr. Halbert. Dkt. 93-3 at ¶¶ 9 and 18.

[4] Rachel Schilling, HSA, testified by affidavit that the medical records reflect that the Lisinopril order was sent to an outside pharmacy on April 11, 2018, to be filled, but "[i]t appears that the order was not filled right away as there was a disconnect with the pharmacy." Dkt. 87-3 at ¶ 5. The Court was not able to identify where in the medical records it reflects that the order was sent to an outside pharmacy, nor is there any explanation of the "disconnect." What is undisputed, is that Mr. Halbert did not receive his Lisinopril medication prior to his medical emergency in May.

diagnostic of a rhythm abnormality or anything consistent with what Mr. Halbert presented with forty (40) days later on May 21, 2018. Dkt. 93-3 at ¶ 19.

On April 25, 2018, Offender Halbert presented for a blood pressure check. Around this time, he continued to have shortness of breath and if he walked to the dining hall he would be sweating profusely and out of breath. Dkt. 93-2 at p. 20. Medical Assistant Lucretia Cheek recorded his blood pressure as 157/97 and his pulse as 100. Dkt. 93-1 at p. 48.

### C. May 18, 2018

Mr. Halbert submitted another health care request form on May 11, 2018, reporting continued shortness of breath and that the antibiotics he was prescribed in March did not help, as his condition has worsened. Dkt. 103-1 at p. 18. Seven days later, on May 18, 2018, in response to this health care request form, Mr. Halbert presented for a Nurse Visit with Nurse Blount. She noted that he had still not received his Lisinopril. Dkt. 105 at p. 3. Mr. Halbert's blood pressure was more moderated at 137/93, with a slightly elevated pulse of 107, and normal respiration of 16, and his pulse oximetry was 100%. His peak flow was recorded as 450. His left and right lungs were clear to auscultation. Dkt. 93-1 at pp. 50-51. He was referred for a physician evaluation, and Nurse Blount noted possible allergy issues.  Dkt. 93-1 at p. 52.

### D. May 20, 2018

On May 20, 2018, Mr. Halbert coughed for several hours throughout the night and early morning. Dkt. 97 at p. 25. Around 5:30 a.m., Mr. Halbert woke another inmate and told him that he felt like he could be having a heart attack. *Id.* at p. 26. Mr. Halbert and the other inmate got dressed, and then went to speak with Officer Ball, a correctional officer assigned to their dorm. *Id.* Officer Ball has no medical training. Dkt. 97-2 at ¶ 9. Mr. Halbert and his inmate escort signaled

for Officer Ball to allow them out of the pod to speak with her. She opened the door and spoke with them in the corridor. Dkt. 97-1 at p. 26.

The inmates explained to Officer Ball what was happening. Officer Ball paid attention to what Mr. Halbert was saying. *Id.*

After Officer Ball received the information about Mr. Halbert's condition, she explained that she would not call a Signal 3000—an emergency signal—because the last time she did the medical department was angry at her.[5] Instead, she stated that she was going to call medical for guidance. *Id.* This decision was consistent with Officer Ball's training. GEO trains its correctional officers, like Officer Ball, to contact medical and/or her supervisors when an offender seeks to be seen by medical staff or is complaining about a medical condition. Dkt. 97-4 at p. 2; Dkt. 97-5 at p. 2.

Officer Ball then made the call to medical, and Mr. Halbert was able to hear her end of the conversation. She gave an accurate synopsis of what Mr. Halbert and the other inmate had reported about Mr. Halbert's condition but not with same level of severity or panic. Dkt. 97-1 at p. 26-27.

Officer Ball, while speaking with Nurse Davis and Nurse Sherron, was informed that Mr. Halbert had just been seen by medical personnel and that he had been diagnosed with a virus. Dkt. 97-6 at p. 1-2; dkt. 97-5 at p. 2; dkt. 103-1 at p. 5 (Officer Ball's interrogatories reflecting she spoke with both nurses separately). Given this information, and her observation of Mr. Halbert, who was responsive and did not appear to be in the type of distress that would trigger her to issue a "Signal 3000," did not take further action. *Id.*

---

[5] Health Services Administrator Schilling testified that a medical emergency, or a Signal 3000, should be called by custody staff anytime an offender is unresponsive or has a life-threatening illness. Dkt. 87-3 at ¶13. Essentially, if a call to 9-1-1 was warranted outside of the IDOC, a Signal 3000 was warranted inside the facility. Wexford does not have a policy defining a Signal 3000. That is a custody protocol. Dkt. 87-3 at ¶13.

Officer Ball told Mr. Halbert that medical would not be coming down. Dkt. 87-4 at p. 27. He felt "totally helpless" and thought he "was going to die." *Id.* Mr. Halbert and his inmate escort returned to Mr. Halbert's bunk. *Id.* A few minutes later, Officer Ball visited Mr. Halbert at his bunk. Officer Ball asked Mr. Halbert if maybe he was suffering from anxiety and shared her own experience and how thinking of positive things helps her during an anxiety attack. *Id.* at p. 28. Mr. Halbert assured her it was not an anxiety attack. Officer Ball's shift then ended, and she left for the day. *Id.*

Mr. Halbert laid in his bunk and tried to move around slowly thinking it might help control his breathing, but when he tried to walk, he would end up sweating and bent over out of breath. Dkt. 87-4 at p. 28.

In August 2018, Officer Ball completed an incident report based on these events. She reported that on May 20, 2018, she was asked to call medical because Mr. Halbert was suffering from severe shortness of breath and rapid heartbeat. Dkt. 103-1 at p. 3. In her "opinion, Mr. Halbert was very afraid and severely stressed about his condition." *Id.* She "called medical to ask for him to be seen, and the nurse on duty, whom I believe was Nurse Davis said we know Mr. Halbert and he probably has an infection or allergies. Do not send him to medical and we're not coming down. If he falls out, we'll see him." *Id.*

**E. May 21, 2018**

On May 21, 2018, Mr. Halbert's wife, Rhonda Lee Halbert, called the facility and spoke with Ms. Scott. Ms. Scott set Mr. Halbert up with an appointment at 2:00 p.m. Dkt. 103-1 at p. 9. Mr. Halbert testified that between May 20, 2018, and his appointment with Dr. Robertson on May 21, 2018, his symptoms had somewhat subsided, such that he was able to walk with great difficulty by himself to medical. Dkt. 87-4 at p. 29.

At 3:14 p.m., Mr. Halbert presented to Dr. Robertson for a physician patient encounter. Mr. Halbert complained of shortness of breath and reported that he still had not received his blood pressure medication. This was Dr. Robertson's first notification that Mr. Halbert had not received Lisinopril as ordered on April 11, 2018. Dr. Robertson noted reduced intensity of his breath sounds. He also noted trace edema in his legs. Dkt. 93-1 at pp. 53 and 57. Mr. Halbert's vital signs were recorded as: blood pressure 158/113, pulse 108 with a regular rate and rhythm, respiration 20, and pulse oximetry of 99% on room air. *Id.*

Dr. Robertson could not figure out what was wrong, and given Mr. Halbert's presenting condition and vital signs, Dr. Robertson ordered an EKG. The EKG was performed in the prison medical clinic and confirmed an abnormal rhythm strip. Dr. Robertson immediately referred Mr. Halbert to the emergency room. Nursing staff called for emergency transfer to Henry County Hospital. Dkt. 93-1 at pp. 53-58; dkt. 93-3 at ¶ 12.

The emergency room physician diagnosed Mr. Halbert with elevated troponin and acute congestive heart failure and transferred him to St. Vincent Indianapolis for further evaluation. Dkt. 93-1 at pp. 108-109; dkt. 93-3 at ¶ 13.

**F. May 22, 2018**

Mr. Halbert was transferred to St. Vincent Hospital in Indianapolis on May 22, 2018, with a principal admission diagnosis of hypertensive emergency with new onset of heart failure. Dkt. 93-3.

While admitted to St. Vincent, Mr. Halbert was diuresed with Lasix. Cardiology was timely consulted to manage his transient cardiomyopathy, which was thought to be due to a hypertensive crisis. Mr. Halbert's symptoms of congestive heart failure rapidly improved, and he was discharged back to New Castle the following day. At the time of discharge, he appeared to be stable with

relatively well-controlled blood pressure. His principal discharge diagnosis was acute systolic heart failure due to hypertensive crisis. His prognosis was good, and he was given a referral to follow-up with cardiology. Dkt. 93-3 at ¶ 15; dkt. 93-1 at pp. 185-189.

### G. May 23, 2018

Mr. Halbert's medical records reflect that he returned from the hospital on May 23, 2018, stating that he was on some new medications. Dkt. 87-3 at ¶ 6. The discharge paperwork reflects that it was faxed from St. Vincent to "Henry County Correctional" on May 23, 2018. Dkt. 93-1 at p. 251.

### H. Delays in Medication

It was not until June 4, 2018, however, that Mr. Halbert's medical records reflect that a request was sent from the providers at New Castle to St. Vincent Hospital requesting Mr. Halbert's discharge summary. Dkt. 87-3 at ¶ 6.[6] Mr. Halbert's medical records were eventually updated with an administrative note that reflects new prescriptions for aspirin, atorvastatin, spironolactone, furosemide, carvedilol, and Lisinopril. Dkt. 87-5 at p. 13; Dkt. 103-1 at pp. 14-15; Dkt. 93-1 at pp. 189-257. It was on this date that Mr. Halbert first began receiving his prescribed medications. Dkt. 103-1 at p. 10.

Mr. Halbert's trouble accessing medical care did not end in June. For example, in September or October 2018, Mr. Halbert did not receive his Carvedelol medication for a period of 19 days. In December 2018, Mr. Halbert filed a grievance after learning that he was never given the Spironolactone medication he was prescribed upon discharge from the hospital. This medication

---

[6] HSA Schilling testified that not all of the paperwork accompanied Mr. Halbert from the hospital and that the New Castle trip officer said that the hospital was aware of the incomplete paperwork and was going to fax the rest. Dkt. 87-3 at ¶ 6. However, Ms. Schilling's testimony is purportedly based on the medical records, and the record she references does not include this information. *See* dkt. 87-5 at p. 8. Accordingly, this fact is not sufficiently supported by the record.

was not provided for more than six months. In January 2020, Mr. Halbert filed a grievance reporting that his medication was denied for a period of 15 days resulting in an increase in his blood pressure. Dkt. 103-1 at p. 10.

### III. Discussion

Mr. Halbert alleges that the individual defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment and that the corporate defendants, GEO and Wexford, should be held responsible for their employee's actions.

### A. Eighth Amendment – Deliberate Indifference

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (internal quotation and citation omitted).

"In the inadequate medical care context, deliberate indifference does not equate to medical malpractice; the Eighth Amendment does not codify common law torts. And we must give medical professionals a great deal of deference in their treatment decisions. Accordingly, a constitutional violation exists only if no minimally competent professional would have so responded under those circumstances." *Id.* at 825 (internal quotations and citations omitted). "When a plaintiff's claim focuses on a medical professional's treatment decision, the decision must be so far afield of

accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Id.*

For purposes of the pending motions for summary judgment, Defendants do not dispute that Mr. Halbert's hypertensive crisis and heart failure are objectively serious medical conditions. Dkt. 86 at p. 18; Dkt. 92 at p. 9; Dkt. 96 at p. 9. The dispute, as in most claims of deliberate indifference, lies in whether the prison official knew of and disregarded an excessive risk to inmate health and safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Johnson*, 5 F.4th at 825. Though establishing deliberate indifference requires more than negligence, Mr. Halbert need not show purposeful conduct. *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).

*1. Dr. Robertson*

Dr. Robertson argues that he is entitled to summary judgment because he did not ignore a risk of harm to Mr. Halbert. Rather, he argues, the treatment he provided was appropriate for Mr. Halbert's hypertension as was the care he provided during Mr. Halbert's hypertensive crisis. Dkt. 92 at p. 13. In response, Mr. Halbert ultimately argues that Dr. Robertson should have done more sooner to diagnose his hypertension and heart failure.

First, Mr. Halbert argues that Dr. Robertson should not have signed off on Nurse Isaacs' suspected viral infection diagnosis by prescribing him an antibiotic (Z-Pack) for his cough on March 30, 2018. Instead, Dr. Robertson should have examined him and given him an EKG when he first reported shortness of breath. Dkt. 105 at p. 3. He speculates that if his heart problems were identified as early as March 30, 2021, nursing staff would not have delayed Mr. Halbert's medical treatment for nearly two days when he later suffered a hypertensive crisis resulting in heart failure. Dkt. 105 at p. 2.

In this case, Nurse Isaac and Dr. Robertson must be given a great deal of deference in their decision to treat Mr. Halbert's complaints on March 30 with an antibiotic and without further physical examination. There is no evidence upon which to conclude that this treatment decision (even if in error) was not based on their medical judgment and "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976).

In addition, when Dr. Robertson did personally examine Mr. Halbert, he responded appropriately. For example, on April 11, 2018, Dr. Robertson examined Mr. Halbert and correctly diagnosed him with hypertension and prescribed Lisinopril. Mr. Halbert asserts that he should have also been given an EKG at this time, because he set forth his concerns regarding exertional shortness of breath in his health care request forms.[7] Dr. Robertson's expert testified, however, that even if an EKG had been ordered during Mr. Halbert's first personal encounter with Dr. Robertson on April 11, 2018, that it would not have been diagnostic of a rhythm abnormality or anything consistent with what Mr. Halbert presented with forty days later. Dkt. 93-3 at ¶ 19. Under these circumstances, Dr. Robertson's failure to order an EKG on April 11, 2018, is at most negligence and not deliberate indifference.

Finally, when Mr. Halbert saw Dr. Robertson on May 21, 2018, Dr. Robertson timely and appropriately evaluated him. Dr. Robertson performed a physical examination, ordered an EKG, diagnosed him with an acute rhythm abnormality, and then immediately referred him out to the local hospital for emergency triage. Dkt. 92 at p. 12.

---

[7] There is no indication that Dr. Robertson reviewed Mr. Halbert's health care request forms when making his treatment decisions.

Based on the foregoing, Dr. Robertson was not deliberately indifferent to Mr. Halbert's serious medical needs and he is entitled to judgment as a matter of law in his favor.

### 2. *Officer Ball*

Mr. Halbert alleges that Officer Ball displayed deliberate indifference to his serious medical needs when he complained to her about his health, and she contacted medical staff instead of issuing an emergency signal. He argues that she had a duty to keep him safe and that she also had discretion to issue a Signal 3000 that would have brought medical personnel to the scene. Dkt. 100 at p. 1; dkt. 101 at pp. 2-5.

In effect, Mr. Halbert seeks to hold Officer Ball personally liable for relying on medical staff to determine what treatment he required. Seventh Circuit caselaw, however, reflects that such a claim is unsupported by existing precedent.

> A prison official, however, generally does not act with deliberate indifference "if she reasonably relied on the judgment of medical personnel." *Miranda v. Cnty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018). Non-medical officials are presumptively "entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care." *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008); *see also King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (reiterating that non-medical officers "were 'entitled to defer to the judgment of jail health professionals so long as [they] did not ignore [the prisoner]'" (alterations in original) (quoting *Berry*, 604 F.3d at 440)); *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants . . . can rely on the expertise of medical personnel.").

*Eagan v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021).

*Eagen* applies here. The undisputed facts reflect that Officer Ball paid attention to what Mr. Halbert and his inmate escort were saying. She understood that Mr. Halbert was suffering from severe shortness of breath and rapid heartbeat. She believed Mr. Halbert was very afraid and severely stressed about his condition. She immediately called medical to ask for him to be seen, which was consistent with her training. Officer Ball gave medical an accurate synopsis of what

Mr. Halbert and the other inmate reported about Mr. Halbert's condition, although not with the same level of panic. Medical stated they would not come see Mr. Halbert. Mr. Halbert returned to his bunk and a few minutes later, Officer Ball visited. Officer Ball talked to Mr. Halbert about anxiety and shared her own experience in an effort to help. After that, Officer Ball's shift ended, and she left for the day.

These actions reflect Officer Ball's reasonable reliance on the medical providers' instructions and do not reflect deliberate indifference. "The 'deliberate indifference' standard requires a showing that the defendant had a 'sufficiently culpable state of mind' and asks whether the official actually believed there was a significant risk of harm." *Miranda v. Cty. of Lake*, 900 F.3d 335, 350 (7th Cir. 2018) (quoting *Pittman ex rel. Hamilton v. Cnty. of Madison*, 746 F.3d 766, 775–76 (7th Cir. 2014)).

Officer Ball is not a medical professional. She immediately requested medical assistance but was advised that further action was not necessary. In hindsight, Mr. Halbert was experiencing a hypertensive emergency with heart failure and an emergency response would have been appropriate. But Officer Ball did not know this. Instead, she relied on the inaccurate information provided to her by medical staff as she was trained to do. *Farmer*, 511 U.S. at 837. In other words, there is no evidence that Officer Ball was aware of a substantial risk of serious harm after consulting with the nurses. *Jones v. Mathews*, 2 F.4th 607, 613 (7th Cir. 2021) (affirming summary judgment where there was no evidence establishing that prison official was aware of the risk of substantial harm that plaintiff ultimately suffered—death from diphenhydramine toxicity). In addition, Officer Ball's conduct after speaking with the nurses reflects that she thought Mr. Halbert was having an anxiety attack and followed up with him in an effort to help before her shift ended.

In the absence of any evidence of a sufficiently culpable state of mind, Officer Ball is entitled to judgment as a matter of law in her favor.

### 3. Heather Davis, RN, and Christopher Sherron, RN

Mr. Halbert sues both Mr. Sherron and Ms. Davis. They argue that in the absence of any proof of who answered the phone on May 20, Mr. Halbert is unable to establish that Mr. Sherron or Ms. Davis participated in alleged misconduct and no reasonable jury could find in his favor. Dkt. 86 at p. 19. This argument is not persuasive. Mr. Sherron and Ms. Davis were two of three medical employees working at the relevant time. In addition, Officer Ball testified that she spoke to both Mr. Sherron and Ms. Davis on May 20, in her efforts to get Mr. Halbert medical attention during his hypertensive crisis.

Mr. Sherron and Ms. Davis argue that even if they spoke to Officer Ball on the phone on May 20, 2018, they were not deliberately indifferent when they refused to see Mr. Halbert or arrange for swift medical evaluation. They contend that neither of them knew of and disregarded a substantial risk to Mr. Halbert's health and safety because medical staff, no matter who answered the phone on that day, was aware that Mr. Halbert had just been seen on May 18, 2018, that he was being monitored for either a bacterial infection or allergy issues, and that he was scheduled to see the provider already although there is no indication of the timing of that appointment. Dkt. 86 at p. 19.

Again, this speculative argument is not persuasive and runs counter to the Court's standard of review on summary judgment. Mr. Sherron and Ms. Davis have each sworn that they do not have any recollection of what happened on May 20, such that they cannot testify to what they were aware of at the time. Nor can they assert that they even considered the medical records.

Further, the medical records at the time reflected that Mr. Halbert had been diagnosed with hypertension, had not received the medication he was prescribed for that disease, that his hypertension was not controlled at his most recent appointment, that his symptoms worsened even after taking powerful antibiotics, and that he was complaining of heart attack like symptoms. A reasonable jury could conclude that the failure of Mr. Sherron and Ms. Davis to immediately seek further evaluation of Mr. Halbert's symptoms and to direct that no further action be taken unless he "fell out" was deliberate indifference. *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 (7th Cir. 2021) (stating plaintiff can show a medical professional disregarded a serious medical need if their "professional[] subjective response was so inadequate that it demonstrated an absence of professional judgment."). The nurses "inexplicable delay" in responding to an Mr. Halbert's complaints indicating he was having heart problems is evidence upon which a jury could find them deliberately indifferent. *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020).

Further, Mr. Halbert was injured as a result of the nurses' failure to assist Mr. Halbert in receiving medical treatment. As a result of the delay in treatment, Mr. Halbert suffered in serious pain and distress that was quickly mitigated at the hospital with proper treatment. The fact that an EKG was required before the doctor fully understood the emergent nature of Mr. Halbert's situation does not excuse the nurses' failure to seek that evaluation at the time they were notified by Officer Ball of the suspected medical emergency.

The facts in this case are similar to those in *Williams v. Liefer*, 491 F.3d 710, 715–16 (7th Cir. 2007). "Plaintiff Williams' medical records and the medical expert's testimony showed that when Williams arrived at the hospital, he had elevated blood pressure, had an abnormal EKG, was sweating, and complained of severe pain. The medical records also showed that with treatment, Williams' symptoms, including his pain and high blood pressure, quickly subsided. The only

testimony from a medical expert, Dr. Doughty, was that the delay did not appear to have adversely affected Williams' condition." *Id.*

The Seventh Circuit denied defendants post-verdict motion arguing that they were entitled to judgment as a matter of law because Williams lacked sufficient verifying medical evidence that the delay in treatment harmed him. "[A] reasonable jury could have concluded from the medical records that the delay unnecessarily prolonged and exacerbated Williams' pain and unnecessarily prolonged his high blood pressure. *See Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (recognizing that 'hours of needless suffering' can constitute harm). The medical records indicate that the nitroglycerin almost immediately relieved his pain and lowered his blood pressure, so a jury could find that the defendants' delay caused Williams six extra hours of pain and dangerously elevated blood pressure for no good reason." *Williams,* 491 F.3d at 715–16. *Williams* controls.

For these reasons, Ms. Davis and Mr. Sherron's motion for summary judgment is **denied**. A jury could conclude that they were deliberately indifferent to Mr. Halbert's hypertensive crisis and heart failure and as a result he was injured by suffering in pain and distress needlessly for a day and a half.

### B. GEO GROUP, INC. and WEXFORD OF INDIANA, LLC

GEO Group, Inc. and Wexford of Indiana, LLC, act under color of state law by contracting to perform a government function. *See Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010); *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 fn.6 (7th Cir. 2002). Thus, these companies may be liable for damages under § 1983 only under the theory announced in *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978). *See Walker v. Wexford Health Sources*, 940 F.3d 954, 966 (7th Cir. 2019). "Prevailing on such a claim requires evidence that a Wexford [or GEO] policy, practice, or custom caused" the constitutional violation alleged. *Id.* "[A] showing of

isolated incidents does not create a genuine issue as to whether defendants have a general policy or a widespread practice of an unconstitutional nature." *Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003). In addition, neither company can be "held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior* for constitutional violations committed by [its] employees." *Simpson v. Brown County*, 860 F.3d 1001, 1005-6 (7th Cir. 2017).

Both companies seek summary judgment on the basis that Mr. Halbert cannot present any evidence that he was injured as a result of a policy, practice, or custom of GEO or Wexford.

### 1. GEO Group, Inc.

Mr. Halbert is understood to argue that he was injured by GEO's policy when he sought to access emergency medical treatment through a GEO employee, but no medical care was provided for a day and a half. In response, GEO argues that there is no formal policy upon which Mr. Halbert can rely to support his claim against GEO.

GEO is mistaken. GEO's policy, which was followed by Officer Ball, is for correctional officers and staff to contact medical staff when there exists a serious medical claim from an offender. GEO policy also provides that an officer should issue a "Signal 3000" when an inmate appears to be in obvious distress or is unresponsive.

The critical question for finding a corporation liable under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), "is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 568 (7th Cir. 2021) (quoting *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc). "[I]f institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible." *Id.* (quoting *Glisson*, 849 F.3d at 379).

In this case, the evidence reflects that Officer Ball wanted Mr. Halbert to be seen by medical and that she followed GEO's policy to obtain care. A reasonable juror could conclude that GEO's policy reflects deliberate indifference to Mr. Halbert's serious medical needs and that he was injured as a result. As a prisoner, Mr. Halbert does not have the ability to call 911 or obtain emergency medical care on his own. Instead, he had to rely on GEO employees to get him the emergency medical care he needed when his hypertensive crisis triggered heart failure.

As GEO points out in its brief in support of summary judgment, Officer Ball did not issue an emergency medical signal or "Signal 3000" because Mr. Halbert was alert and oriented and because medical staff told her Mr. Halbert would not be seen unless he "fell out." Dkt. 96 at p. 2. Had Officer Ball been given the opportunity to make her own initial assessment, she would have issued a Signal 3000 to summon medical providers to provide Mr. Halbert care. She did not take this step, however, because she had gotten in trouble for using her independent judgment in the past. Instead, consistent with policy, she called the medical department where two nurses told her not to send Mr. Halbert over and that Mr. Halbert would not be seen unless he fell out.[8] At that point, consistent with GEO's policy, Officer Ball took no further action. As a result, Mr. Halbert's hypertensive crisis continued for another day and a half before he obtained evaluation and treatment.

Mr. Halbert should not have "fall out" to receive medical care for his severe shortness of breath and rapid heartbeat that caused fear and severe stress. Dkt. 103-1 at p. 3. In fact, those symptoms were a result of Mr. Halbert's hypertensive crisis that was triggering heart failure.

---

[8] They also gave her inaccurate or misleading information. They said that Mr. Halbert had been seen recently, but his most recent visit with Nurse Blount reflected that his hypertension was not under control and that an appointment with a physician had been requested. Nurse Blount noted without any supporting facts that there could be allergy issues.

Relatedly, GEO employees should be able to access medical care for offenders before they "fall out." The implementation of GEO's policy did not even result in a record of Officer Ball's call to medical or any additional monitoring by GEO, nor did any other GEO employee make any additional inquiries to the medical department during Mr. Halbert's day and a half wait to be seen by medical. Instead, he was only scheduled for an appointment after his wife called the facility.

Under these circumstances, a jury could find that GEO's policies are deliberately indifferent to the quality of care provided. Accordingly, GEO's motion for summary judgment is **DENIED.**

### 2. Wexford of Indiana, LLC

In response to Wexford's motion for summary judgment Mr. Halbert asserts that the Defendants do not have immunity and can be sued. Dkt. 103 at p. 5. Mr. Halbert is correct, that the defendant companies do not have immunity under the Eleventh Amendment which bars private lawsuits in federal court against a state that has not consented. *Joseph v. Board of Regents of University of Wisconsin System*, 432 F.3d 746, 748 (7th Cir. 2005). But even in the absence of immunity, Mr. Halbert cannot prevail against Wexford unless he has evidence that he was injured as a result of their policy, practice, or custom.

Mr. Halbert argues that Wexford is responsible for delaying his prescribed medications. However, the evidence in support of this claim is based on three isolated incidents. First, he alleges that he did not receive his Lisinopril when it was first prescribed by the doctor. Next, Mr. Halbert alleges that he went without his prescribed carvedilol from September 6, 2018, through September 25, 2018. Lastly, Mr. Halbert alleges that he went six months without receiving his prescribed spironolactone. These three examples are insufficient to demonstrate that Wexford has a policy or practice of delaying inmates access to their prescribed medications. *See Walker v. Peters*, 233 F.3d 494, 500 (7th Cir. 2000) (holding that isolated incidents of delay in administering medications did

not amount to deliberate indifference); *Quinn,* 8 F.4th at 568 (explaining that showing systemic deficiencies in Wexford's procedures or lack thereof on summary judgment "is a difficult task when allegations stem from the experiences of one person"). Accordingly, Wexford is entitled to judgment as a matter of law.

Wexford is entitled to summary judgment in its favor.

### IV. Conclusion

Dr. Robertson, Officer Ball, and Wexford of Indiana, LLC, did not violate Mr. Halbert's constitutional rights.

The motion for summary judgment brought by Alumni Staffing, LLC, in substitution for Dr. Kenneth Robertson, MD, dkt [91], is **GRANTED.**

The motion for summary judgment filed by Officer Ball and GEO, dkt. [95], is **GRANTED** as to Officer Ball and **DENIED** as to GEO.

The motion for summary judgment filed by defendants Heather N. Davis, Christopher J. Sherron, and Wexford, dkt. [85], is **GRANTED** as to Wexford and **DENIED** as to Ms. Heather Davis and Mr. Christopher Sherron.

The Eighth Amendment deliberate indifference claims against Ms. Heather Davis and Mr. Christopher Sherron for delaying Mr. Halbert's access to evaluation by a doctor during his cardiac emergency remains pending. Similarly, the claim that GEO's policies or customs are

deliberately indifferent to the consitutionally required level of care provided to prisoners such as Mr. Halbert shall proceed. These claims shall be resolved by settlement or at trial.

If Mr. Halbert seeks the assistance of counsel with settlement or trial, he should file a motion using the Court's form motion for assistance recruiting counsel. The **clerk is directed** to send Mr. Halbert a blank form motion for this purpose with his copy of this Order.

**IT IS SO ORDERED.**

Date: 9/30/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

DAVID HALBERT
872908
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Adam Garth Forrest
BBFCS ATTORNEYS
aforrest@bbfcslaw.com

Blair Martin Roembke
EICHHORN & EICHHORN LLP (Indianapolis)
broembke@eichhorn-law.com

Michael Roth
EICHHORN & EICHHORN LLP (Indianapolis)
mroth@eichhorn-law.com

Erika Lauren Steuerwald
KATZ  KORIN CUNNINGHAM, P.C.
esteuerwald@kkclegal.com